IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SANDRA SALAMONE, et ux. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| Wal-Mart STORES EAST, LP, et al. | : | NO. 10-CV-892 |

**MEMORANDUM AND ORDER**

Ditter, J.                                                                    July 15, 2011

      This case arises from a slip and fall at a Wal-Mart store. The plaintiff, Sandra Salamone, filed this lawsuit alleging injuries to her knee and back as a result of her fall in water pooled beside a Pepsi soda cooler located at the self-serve check-out aisle of the store. Before me is the motion of defendant, Wal-Mart Stores East, L.P., to preclude the reports and testimony of Rosette C. Biester, Ph.D. (Doc. # 30) pursuant to Federal Rule of Evidence 702. For the reasons that follow, this motion *in limine* is GRANTED.

      The admissibility of expert testimony under Rule 702 is a question of law for the district court. I must make a preliminary determination, pursuant to Rule 104(a), as to whether the expert testimony satisfies the standard of "evidentiary reliability" established by the rule and will assist the trier of fact to understand or determine a fact in issue. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 57, 592 (1993). This gatekeeping role requires that I consider three basic requirements: (1) qualification – whether the expert is qualified to speak with authority on a particular subject; (2) reliability – whether the expert's methodology is sound and whether her opinion is supported by "good grounds;" and (3) fit – whether there is a relevant

"connection between the scientific research or test result to be presented and particular disputed factual issues in the case." *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 741-43 (3d Cir. 1994) ("*Paoli II*").

First, I consider whether Dr. Biester has sufficient knowledge, skill, training, education, or experience to testify with authority on plaintiff's claim that she suffered a traumatic brain injury. This requirement is liberally construed and does not require that the expert have the most appropriate degree or training.

The defendants do not challenge Dr. Biester's qualifications as a neuropsychologist or her ability to speak with authority on traumatic brain injuries. I find that she is sufficiently qualified to testify as an expert on this subject.

Next, I consider the relevance and reliability of Dr. Biester's proposed expert testimony. To assess reliability, I consider whether her expert opinion is "based on 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" *Paoli II*, 35 F.3d at 742 (citing *Daubert*, 509 U.S. at 590). To evaluate whether the expert has "good grounds" for her opinion, I am guided by a number of factors, including but not limited to: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subjected to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the technique is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. *Id.* at 742 n.8.

In making this preliminary determination, I must engage in a limited review of Dr. Biester's conclusions "in order to determine whether they could reliably flow from the facts

known to the expert and the methodology used." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999). I am not required to admit expert testimony "that is connected to existing data only by the *ipse dixit* of the expert." *General Elect. Co. v. Joiner*, 522 U.S. 136, 145-46 (1997). Rather, I may find that the expert's conclusions, based on the evidence presented to her and the methodology employed, are inadmissible because "there is simply too great an analytical gap between the data and the opinion proffered." *Id.* This is the heart of the motion before me.

I find that Dr. Biester's report is self-contradictory, fails to mention important facts, contains important and unwarranted assumptions, is deliberately misleading, and therefore is completely unreliable. In other words, her opinions do not reliably flow from the facts known to her and the methodology used, and there is too great an analytical gap between those facts and Dr. Biester's opinions.

Ms. Salamone was referred to Dr. Biester for "[a] comprehensive neuropsychological evaluation . . . to determine the presence of cognitive deficits and weaknesses following a serious fall on 4/29/09." *Biester Rep.* 1. As part of this task, Dr. Biester reviewed the medical reports of Ms. Salamone's various treating physicians, but only those that post-date her fall. Dr. Biester was unaware Ms. Salamone had a history of headaches, migraine headaches, difficulty sleeping, a frozen shoulder, an injured rotator cuff, an inability to exercise, and weight- related issues. Those seemingly relevant medical factors were not considered by Dr. Biester in her report nor was there any explanation of why she did not explore whether Ms. Salamone suffered from any preexisting conditions that might impact her current condition.

The post-incident accident and medical reports are also problematic. Dr. Biester relied on Ms. Salamone's statement that she hit her head on the floor when she fell on April 29, 2009, despite no contemporaneous claim of head trauma. The incident report completed by Ms.

Salamone makes no mention of her hitting her head.  Her complaint makes no claim of head pain or a head injury.  Her answers in interrogatories make no reference to her head or any head injury.  There was one reference in Dr. Pearlstein's notes that Ms. Salamone complained of a headache four days after her fall – but no site pain, lump, or contusion was noted and no treatment or testing was ever ordered for a head injury.  Dr. Biester testified that this passing reference to a headache is Ms. Salamone's initial complaint of head trauma.  I disagree:  it is common knowledge that headaches can come from an almost infinite variety of sources and to select one from the hay stack without explanation is fanciful.  In fact, Dr. Biester's report describes Ms. Salamone's headaches as "stress-related."  *Id.* at 4.

Dr. Biester testified that her opinion that Ms. Salamone suffers from a brain trauma is not based on Ms. Salamone's self-reporting of the circumstances of her fall, injuries, and alleged residual deficits, but on the objective testing she conducted during her examination of Ms. Salamone.  A closer look at the testing results, again within the framework of an evaluator who has proceeded with no information concerning the plaintiff's medical history that pre-dates her alleged injury, is required.

Dr. Biester asserts that the "results of this evaluation are judged to be representative of Ms. Salamone's *current levels* of cognitive, mood, and behavioral functioning."  *Biester Rep.* 5; 9 (emphasis added).  Dr. Biester finds that the plaintiff's current intellectual level "is in the Superior range" and that her "overall intellectual capacity is indicative of an intellectually bright individual."  *Id.* at 6.

Nonetheless, Dr. Biester finds that Ms. Salamone's "current Verbal IQ score is judged to be below her pre-injury level, *estimated* to be in the Superior range, based on the strong *suggestion* of higher abilities on the current IQ battery, her high and persistent accomplishment

and achievements professionally, and her educational background, including college performance." *Id.* (emphasis added). From this *estimated suggestion* of prior abilities, absent any previously administered test results, Dr. Biester finds it "*strongly indicates* a *significant* and unfortunate decrease in certain intellectual domains *due to a neurological event*." *Id.* (emphasis added). This estimated finding based on a strong suggestion that strongly indicates the occurrence of a neurological event in certain intellectual domains, while imaginative, is so diaphanous and devoid of factual support that it defies even a pretense of scientific basis.

Indeed, the employment and educational history on which Dr. Biester relies does not support her conclusions. If anything, Ms. Salamone's test scores out-perform her employment history of clerical and retail sales experience, her management positions, her high school As and Bs, and her B average at the Hussian School of Art (which she attended over thirty-five years ago). Furthermore, Dr. Biester contradicts her own assessment of the plaintiff's pre-injury capabilities by asserting that the plaintiff's Performance IQ "better represents her actual IQ functioning than her significantly lower Verbal IQ." Despite this, Dr. Biester relies on Ms. Salamone's "estimated pre-injury abilities" to reach her conclusion that the test results indicate cognitive impairments that are indicative of traumatic brain injury. *Id.* at 10.

Next, I consider what is absent from Dr. Biester's report. There were no contemporaneous reports of any blow to the head or of any physical sign of a head injury, including, pain, coma, unconsciousness, dizziness, amnesia, convulsions, confusion, seizures, or drainage from the nose or ears. Dr. Biester testified that these would all be signs of a severe traumatic brain injury. Other than the one mention of a headache in Dr. Pearlstein's notes (four days after her fall and by a patient with a history of migraines), there is no reference to the head in the months following her fall. Not only are these factors missing from the medical reports –

Ms. Salamone did not report any such occurrences to Dr. Biester. Moreover, Dr. Biester does not discuss whether this information would be valuable to her diagnosis or how these omissions might impact her opinion.

There is no diagnosis of a head injury in Ms. Salamone's medical records and I find Dr. Biester's attempt to characterize Dr. Pearlstein's note from October 21, 2010 as a diagnosis is pure manufacture. In fact, the first mention the she hit her head occurred at Ms. Salamone's deposition on October 15, 2010. At her visit to her family doctor six days later, she reported for the first time various complaints *she* attributed to "head trauma" suffered when she fell. This report is noted by Dr. Pearlstein ("since head trauma patient had been irritable, . . ."). To suggest this was a diagnosis is to overlook that there is no statement as to how the injury occurred, that it was made without any history, examination, or evaluative tests to confirm the injury, the absence of any proposed treatment plan, and that it was noted for the first time a year and one-half after the occurrence. Dr. Pearlstein did not follow-up by ordering a CT scan, MRI, PET, or SPECT testing of Ms. Salamone's head. It is clear to me that the doctor was simply noting Ms. Salome's complaint of "head trauma" (her first to him).[1]

In addition to failing to consider the absence of these relevant facts in reaching her diagnosis of a traumatic brain injury, Dr. Biester also fails to accurately diagnose the severity of the injury she discerned. Only in response to my questioning did Dr. Biester acknowledge that traumatic brain injuries are classified as mild, moderate, or severe – and that Ms. Salamone's alleged injury would be mild. In her report, Dr. Biester makes only a general diagnosis of

---

[1] There is another thing. My curiosity is lit by the fact that Ms. Salamone never told anyone for eighteen months about her head injury and never sought advice or treatment for the major deficits Dr. Biester, twenty-two months after the incident, attributes to it. But what really turns my curiosity's after burners on is why Dr. Biester never posed what appears to be a rather pertinent question. That blow and those deficits are the twin beacons that light the whole field of Dr. Biester's concern – and yet she never asked why didn't you.

traumatic brain injury (repeating this term throughout the report) and opines the injury is permanent. This is a deliberate attempt to mislead – to put things in the worst light, rather than provide the more precise diagnosis that Ms. Salamone's injury was mild.

Dr. Biester testified that she did not rely on Ms. Salamone's statements concerning the fall or her subjective complaints concerning her post-incident deficits to establish her traumatic brain injury – rather she relied on the objective tests performed during her two day evaluation to reach her diagnosis. However, her report contradicts this testimony.

For example, Dr. Biester's report notes that all current symptoms are "as per Ms. Salamone's self-report." *Biester Rep.* 3. This includes her cognitive symptoms, her emotional, mood and personality changes, and her physical complaints (headaches, knee pain, and sleep disturbance). *Id.* at 3-4. Dr. Biester accepts Ms. Salamone's representation that her symptoms began sometime after April 26, 2009, as indicative that they all began in lockstep in their full severity on that date. She relies on this information to conclude that a traumatic brain injury occurred on that date and not at any other time, and that all of Ms. Salamone's symptoms and complaints result from that incident and no other because that is what Ms. Salamone said. Of course, Dr. Biester was unaware of the medical records showing prior complaints of headaches, worry, and sleeplessness – but no matter, as she testified this information would not be relevant to her current diagnosis. Even if that is so, it is certainly relevant to her opinion as to the onset and cause of Ms. Salamone's deficits and each of Dr. Biester's final conclusions and diagnostic impressions relate to causation. *Id.* at 10.

Dr. Biester also concludes that the duration of these symptoms establish that Ms. Salamone's condition is permanent. She makes no reference to any study, test, or evaluation to support this conclusion. She does not consider the lack of any prior medical diagnosis and

treatment and its potential effect on Ms. Salamone's prognosis – is it possible her condition would have improved with treatment if Ms. Salamone had sought treatment? Although Dr. Biester makes recommendations for future treatment, she does not opine about possible benefits of past treatment.

Finally, I consider whether Dr. Biester's proffered testimony fits within the facts of the case – does it assist the jury by providing it with relevant information necessary to make a reasoned decision of the case? Whether expert testimony satisfies this requirement depends on "the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case." *Paoli II*, 35 F.3d at 743.

For all these reasons I find Dr. Biester's testimony unreliable. I also find it will not serve to assist, but to mislead, the jury. Even if her testing establishes some cognitive difficulties, Dr. Biester has no basis for attributing causation to the incident at Wal-Mart – the ultimate determination to be made by the jury. *See Miller v. United States*, 422 F. Supp. 2d 441, 445-45 (D. De. 2006) (opinion that injuries are accident-related based on plaintiff's statement of causation alone is not a medical opinion; a lay person could arguably come to the same conclusion). In addition, the effect of Ms. Salamone's deficits on her ability to perform her work as a district manager are not within the expertise of Dr. Biester.

In sum, I find that Dr. Biester's conclusions cannot be supported by the limited facts presented to her or by the methodology she employed to evaluate Ms. Salamone. Dr. Biester's report and her conclusions are so unreliable that I find they are irrelevant and inadmissible at trial. Dr. Biester's report fails to establish causation, in part, because she did not review any of Ms. Salamone's medical records that pre-date her fall, and therefore, ignored many of the symptoms Ms. Salamone was complaining of before her slip and fall. Moreover, the only

evidence of causation was Ms. Salamone's self-serving statements and those statements were inconsistent with the accident reports and the medical records – that is there was no report of head trauma or injury, no diagnosis of head trauma or injury, and no treatment for head trauma or injury.  Dr. Biester is precluded from testifying at trial and her report cannot be used in any manner including providing a basis for supplemental vocational report prepared by Daniel M. Rappuccii, M.A., LRC, LPC, CRC.

An appropriate order follows.